1  Jo-Ann Chianella
2  18521 E Queen Creek Rd., Ste 105-604
3  Queen Creek , AZ  85142
4  480-430-3580
5     **PRO SE**
6

☒ FILED     ___ LODGED
___ RECEIVED  ___ COPY

AUG 1 8 2010

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ & DEPUTY

7        IN THE UNITED STATES DISTRICT COURT
8          FOR THE DISTRICT OF ARIZONA

CV **CIV '10 17 6 4 PHX ROS**

|  |  |
|---|---|
| **Jo-Ann Chianella** | |
| Plaintiff, | |
| vs. | **PETITION FOR TEMPORARY** |
| **BAC Home Loans Servicing, LP** | **INJUNCTION** |
| Defendant | |

9

10                                    Date: August 18, 2010

11  Comes now Jo-Ann Chianella , hereinafter referred to as "Petitioner," and moves the court for

12  relief as herein requested:

13                          **PARTIES**

14  Petitioner is Jo-Ann Chianella , 18521 E Queen Creek Rd., Ste 105-604  Queen Creek  AZ

15  85142. Currently Known Defendant(s) are/is:   BAC Home Loans Servicing, LP, 400

16  Countrywide Way, Simi Valley, CA 93065

17                       **STATEMENT OF CAUSE**

18  Petitioner, entered into a consumer contract for the finance of a primary residence located at

19  5354 S. Peachwood Drive, Gilbert AZ 85298, hereinafter referred to as the "property."

20  Defendants, acting in concert and collusion with others, induced Petitioner to enter into a

21  predatory loan agreement with Defendant.

22  Defendants committed numerous acts of fraud against Petitioner in furtherance of a carefully

23  crafted scheme intended to defraud Petitioner.

24  Defendants failed to make proper notices to Petitioner that would have given Petitioner warning

25  of the types of tactics used by Defendants to defraud Petitioner.

26    Defendants charged false fees to Petitioner at settlement.

27    Defendants used the above referenced false fees to compensate agents of Petitioner in order to
28    induce said agents to breach their fiduciary duty to Petitioner.

29    Defendant's attorney caused to be initiated collection procedures, knowing said collection
30    procedures in the instant action were frivolous as lender is estopped from collection procedures,
31    under authority of Uniform Commercial Code 3-501, subsequent to the request by Petitioner for
32    the production of the original promissory note alleged to create a debt.

33                                    **IN BRIEF**
34                       *(Non-factual Statement of Posture and Position)*

35     It is not the intent of Petitioner to indict the entire industry.  It is just that Plaintiff will be
36    making a number of allegations that, outside the context of the current condition of the real
37    estate industry, may seem somewhat outrageous and counter-intuitive.

38    When Petitioner accuses ordinary individuals of acting in concert and collusion with an
39    ongoing criminal conspiracy, it tends to trigger an incredulous response as it is
40    unreasonable to consider that all Agents, loan agents, appraisers, and other ordinary
41    people, just doing what they have been trained to do, are out to swindle the poor
42    unsuspecting borrower.

43    The facts Petitioner is prepared to prove are that Petitioner has been harmed by fraud
44    committed by people acting in concert and collusion, one with the other.  Petitioner has no
45    reason to believe that the Agent, loan officer, appraiser, and others were consciously aware
46    that what they were doing was part of an ongoing criminal conspiracy, only that it was,
47    and they, at the very least, kept themselves negligently uninformed of the wrongs they
48    were perpetrating.  Petitioner maintains the real culprit is the system itself, including the
49    courts, for failure to strictly enforce the consumer protection laws.

50                       **CAREFULLY CRAFTED CRIMINAL CONNIVANCE**
51                          *(General State of the Real Estate Industry)*

52    ***THE BEST OF INTENTIONS***

53    Prior to the 1980's and 1990's ample government protections were in place to protect
54    <u>consumers</u> and the lending industry from precisely the disaster we now experience.
55    <u>During</u> President Clinton's administration, under the guise of making housing available to

PRELIMINARY INJUNCTION            2 of 27

56 the poor, primary protections were relaxed which had the effect of releasing the
57 unscrupulous on the unwary.

58 Prior to deregulation in the 1980's, lenders created loans for which they held and assumed
59 the risk. Consequently, Americans were engaged in safe and stable home mortgages.
60 With the protections removed, the unscrupulous lenders swooped in and, instead of
61 making loans available to the poor, used the opportunity to convince the unsophisticated
62 American public to do something that had been traditionally taboo; home buyers were
63 convinced to speculate with their homes, their most important investment.

64 BAC Home Loans Servicing, Ameriquest, Countrywide, and many others swooped in and
65 convinced Americans to sell their homes, get out of their safe mortgage agreements, and
66 speculate with the equity they had gained by purchasing homes they could not afford. Lenders
67 created loans intended to fail as, under the newly crafted system, the Lender profited more
68 from a mortgage default than from a stable loan.

69 Companies cropped up who called themselves banks when, in fact, they were only either
70 subsidiaries of banks, or unaffiliated companies that were operated for the purpose of
71 creating and selling promissory notes. As will be demonstrated, these companies then
72 profited from the failure of the underlying loans.

73 ***HOW IT WORKS***

74 Briefly, how it works is this, the Lender would secure a large loan from a large bank,
75 convert that loan into 20 and 30 year mortgages and then sell the promise to pay to an
76 investor.

77 People would set up mortgage companies by securing a large loan from one of the major
78 banks, then convert that loan into 20 and 30 year mortgages. In order to accomplish this
79 an Agent would contract with a seller to find a buyer, bring both seller and buyer to a
80 lender who would secure the title from the seller using the borrowed bank funds for that
81 purpose, and then trade the title to the buyer in exchange for a promissory note.

82 The lender then creates a 20 or 30 year mortgage with money the lender must repay within
83 6 months. As soon as the closing is consummated, the promissory note is sold to an
84 investor pool.

85 Using the instant case as an example, a $511,116.00 note at 8.2500%%  interest over 30
86 years will produce $408,912.86      The lender can then offer to the investor the security

87    instrument (promissory note) at say 50% of it's future value. The investor will, over the

88    life of the note, less approximately 3.00% servicing fees, realize $707,917.94 . The lender

89    can then pay back the bank and retain a handsome profit in the amount of $240,590.67.

90    The lender, however, is not done with the deal.

91    The lender signed over the promissory note to the investor at the time of the trade, but did

92    not sign over the lien document (mortgage or deed of trust). The State of Kansas Supreme

93    Court addressed this issue and stated that such a transaction was certainly legal. However,

94    it created a fatal flaw as the holder of the lien document, at time of sale of the security

95    instrument, received consideration in excess of the lien amount. Since the lien holder

96    received consideration, he could not be harmed. Therefore the lien became an

97    unenforceable document.

98    This begs the question: if keeping the lien would render it void, why would the lender not

99    simply transfer the lien with the promissory note? The reason is because the lender will

100    hold the lien for three years, file an Internal Revenue Service Form 1099a, claim the full

101    amount of the lien as abandoned funds, and deduct the full amount from the lender's tax

102    liability. The lender, by this maneuver, gets consideration a second time. And still the

103    lender is not done profiting from the deal.

104    After sale of the promissory note, the lender remains as the servicer for the investor. The

105    lender will receive 3% of each payment the lender collects and renders to the investor

106    pool. However, if the payment is late, the lender is allowed to assess an extra 5% and keep

107    that amount. Also, if the loan defaults, the lender stands to gain thousands for handling the

108    foreclosure.

109    The lender stands to profit more from a note that is overly expensive, than from a good

110    stable loan. And where, you may ask, does all this profit come from? It comes from the

111    equity the borrower had built up in the home. And still the lender is not finished profiting

112    from the deal.

113    Another nail was driven in the American financial coffin when on the last day Congress

114    was in session in 2000 when restrictions that had been in place since the economic

115    collapse of 1907 were removed. Until 1907 investors were allowed to bet on stocks

116    without actually buying them. This unbridled speculation led directly to an economic

117    collapse. As a result the legislature banned the practice, until the year 2000. In 2000 the

118    unscrupulous lenders got their way on the last day of the congressional session. Congress

119  removed the restriction banning derivatives and again allowed the practice, this time
120  taking only 8 years to crash the stock market.   This practice allowed the lender to profit
121  further from the loan by betting on the failure of the security instrument he had just sold to
122  the unwary investor, thus furthering the purpose of the lender to profit from both the
123  borrower (consumer) and the investor.

124  The failure of so many loans recently resulted in a seven hundred and fifty billion dollar
125  bailout at the expense of the taxpayer.   The unsuspecting consumer was lulled into
126  accepting the pronouncements of the lenders, appraisers, underwriters, and trustees as all
127  were acting under the guise of government regulation and, therefore, the borrower had
128  reason to expect good and fair dealings from all.  Unfortunately, the regulations in place to
129  protect the consumer from just this kind of abuse were simply being ignored.

130  The loan origination fee from the HUD1 settlement statement is the finder's fee paid for
131  the referral of the client to the lender by a person acting as an agent for the borrower.
132  Hereinafter, the person or entity who receives any portion of the yield spread premium, or
133  a commission of any kind consequent to securing the loan agreement through from the
134  borrower will be referred to as "Agent."  The fee, authorized by the consumer protection
135  law is restricted to 1% of the principal of the note.  It was intended that the Agent, when
136  seeking out a lender for the borrower, would seek the best deal for his client rather than
137  who would pay him the most.  That was the intent, but not the reality.  The reality is that
138  Agents never come away from the table with less than 2% or 3% of the principal.  This is
139  accomplished by undisclosed fees to the Agent in order to induce the Agent to breach his
140  fiduciary duty to the borrower and convince the borrower to accept a more expensive loan
141  product than the borrower qualifies for.  This will generate more profits for the lender and,
142  consequently, for the Agent.

143  It is a common practice for lenders to coerce appraisers to give a higher appraisal than is
144  the fair market price.  This allows the lender to increase the cost of the loan product and
145  give the impression that the borrower is justified in making the purchase.

146  The lender then charges the borrower an underwriting fee in order to convince the
147  borrower that someone with knowledge has gone over the conditions of the note and
148  certified that they meet all legal criteria.  The trustee, at closing, participates actively in the
149  deception of the borrower by placing undue stress on the borrower to sign the large stack
150  of paperwork without reading it.  The trustee is, after all, to be trusted and has been paid to

PRELIMINARY INJUNCTION          5 of 27

151 insure the transaction. This trust is systematically violated for the purpose of taking unfair
152 advantage of the borrower.   The entire loan process is a carefully crafted contrive
153 connivance designed and intended to induce the unsophisticated borrower into accepting a
154 loan product that is beyond the borrowers means to repay. With all this, it should be a
155 surprise to no one that this country is having a real estate crisis.

156 ## PETITIONER WILL PROVE THE FOLLOWING

157 Petitioner is prepared to prove, by a preponderance of evidence that:

158 - Lender has no legal standing to bring collection or foreclosure claims against the
159   property;

160 - Lender is not a real party in interest in any contract which can claim a collateral
161   interest in the property;

162 - even if Lender were to prove up a contract to which Lender had standing to enforce
163   against Petitioner, no valid lien exists which would give Lender a claim against the
164   property;

165 - even if Lender were to prove up a contract to which Lender had standing to enforce
166   against Petitioner,  said contract was fraudulent in its creation as endorsement was
167   secured by acts of negligence, common law fraud, fraud by non-disclosure, fraud in
168   the inducement, fraud in the execution, usury, and breaches of contractual and
169   fiduciary obligations by Mortgagee or "Trustee" on the Deed of Trust, "Mortgage
170   Agents," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of
171   Pooled Assets," "Trustee or officers of Structured Investment Vehicle,"
172   "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of
173   'Asset-Backed Certificates,'" "Seller of 'Asset-Backed' Certificates (shares or
174   bonds)," "Special Servicer" and Trustee, respectively, of certain mortgage loans
175   pooled together in a trust fund;

176 - Defendants have concocted a carefully crafted connivance wherein Lender
177   conspired with Agents, et al, to strip Petitioner of Petitioner's equity in the property
178   by inducing Plaintiff to enter into a predatory loan inflated loan product;

179 - Lender received unjust enrichment in the amount of 5% of each payment made late
180   to Lender while Lender and Lender's assigns acted as servicer of the note;

181     • Lender and Lender's assigns, who acted as servicer in place of Lender, profited by
182        handling the foreclosure process on a contract Lender designed to have a high
183        probability of default;

184     • Lender intended to defraud Investor by converting the promissory note into a
185        security instrument and selling same to Investor;

186     • Lender intended to defraud Investor and the taxpayers of the United States by
187        withholding the lien document from the sale of the promissory note in order that
188        Lender could then hold the lien for three years, then prepare and file Internal
189        Revenue Form 1099a and falsely claim the full lien amount as abandoned funds
190        and deduct same from Lender's income tax obligation;

191     • Lender defrauded backers of derivatives by betting on the failure of the promissory
192        note the lender designed to default;

193     • participant Defendants, et al, in the securitization scheme described herein have
194        devised business plans to reap millions of dollars in profits at the expense of
195        Petitioner and others similarly situated.

196        **PETITIONER SEEKS REMEDY**

197 In addition to seeking compensatory, consequential and other damages, Petitioner seeks
198 declaratory relief as to what (if any) party, entity or individual or group thereof is the
199 owner of the promissory note executed at the time of the loan closing, and whether the
200 Deed of Trust (Mortgage) secures any obligation of the Petitioner, and a Mandatory
201 Injunction requiring re-conveyance of the subject property to the Petitioner or, in the
202 alternative a Final Judgment granting Petitioner Quiet Title in the subject property.

203 ***PETITIONER HAS BEEN HARMED***

204 Petitioner has suffered significant harm and detriment as a result of the actions of Defendants.

205 Such harm and detriment includes economic and non-economic damages, and injuries to
206 Petitioner's mental and emotional health and strength, all to be shown according to proof at trial.

207 In addition, Petitioner will suffer grievous and irreparable further harm and detriment unless the
208 equitable relief requested herein is granted.

209                                    **STATEMENT OF CLAIM**

210        *DEFENDANTS LACK STANDING*

211              **No evidence of Contractual Obligation**

212    Defendants claim a controversy based on a contractual violation by Petitioner but have failed to

213    produce said contract.  Even if Defendants produced evidence of the existence of said contract in

214    the form of an allegedly accurate photocopy of said document, a copy is only hearsay evidence

215    that a contract actually existed at one point in time.  A copy, considering the present state of

216    technology, could be easily altered.  As Lender only created one original and that original was

217    left in the custody of Lender, it was imperative that Lender protect said instrument.

218    In as much as the Lender is required to present the original on demand of Petitioner, there can be

219    no presumption of regularity when the original is not so produced.   In as much as Lender has

220    refused Petitioner's request of the chain of custody of the security instrument in question by

221    refusing to identify all current and past real parties in interest, there is no way to follow said

222    chain of custody to insure, by verified testimony, that no alterations to the original provisions in

223    the contract have been made.    Therefore, the alleged copy of the original is only hearsay

224    evidence that an original document at one time existed.  Petitioner maintains that, absent

225    production of admissible evidence of a contractual obligation on the part of Petitioner,

226    Defendants are without standing to invoke the subject matter jurisdiction of the court.

227              **No Proper Evidence of Agency**

228    Defendants claim agency to represent the principal in a contractual agreement involving

229    Petitioner, however, Defendants have failed to provide any evidence of said agency other than a

230    pronouncement that agency has been assigned by some person, the true identity and capacity of

231    whom has not been established.  Defendants can hardly claim to be agents of a principal then

232    refuse to identify said principal.  All claims of agency are made from the mouth of the agent with

233    no attempt to provide admissible evidence from the principal.

234    Absent proof of agency, Defendants lack standing to invoke the subject matter jurisdiction of the

235    court.

236 **Special Purpose Vehicle**

237 Since the entity now claiming agency to represent the holder of the security instrument is not the
238 original lender, Petitioner has reason to believe that the promissory note, upon consummation of
239 the contract, was converted to a security and sold into a special purpose vehicle and now resides
240 in a Real Estate Mortgage Investment Conduit (REMIC)   as defined by the Internal Revenue
241 Code and as such, cannot be removed from the REMIC as such would be a prohibited
242 transaction.    If the mortgage was part of a special purpose vehicle and was removed on
243 consideration of foreclosure, the real party in interest would necessarily be the trustee of the
244 special purpose vehicle.  Nothing in the pleadings of Defendants indicates the existence of a
245 special purpose vehicle, and the lack of a proper chain of custody documentation gives Petitioner
246 cause to believe defendant is not the proper agent of the real party in interest.

247 *CRIMINAL CONSPIRACY AND THEFT*

248 Defendants, by and through Defendant's Agents, conspired with other Defendants, et al, toward
249 a criminal conspiracy to defraud Petitioner.  Said conspiracy but are not limited to acts of
250 negligence, breach of fiduciary duty, common law fraud, fraud by non-disclosure, and tortuous
251 acts of conspiracy and theft, to include but not limited to, the assessment of improper fees to
252 Petitioner by Lender, which were then used to fund the improper payment of commission fees to
253 Agent in order to induce Agent to violate Agent's fiduciary duty to Petitioner.

254 *AGENT PRACTICED UP-SELLING*

255 By and through the above alleged conspiracy, Agent practiced up-selling to Petitioner.  In so
256 doing, Agent violated the trust relationship actively cultivated by Agent and supported by fact
257 that Agent was licensed by the state.  Agent further defrauded Petitioner by failing to disclose
258 Agent's conspiratorial relationship to Lender,   Agent violated Agent's fiduciary duty to
259 Petitioner and the duty to provide fair and honest services, through a series of carefully crafted
260 connivances, wherein Agent proactively made knowingly false and misleading statements of
261 alleged fact to Petitioner, and by giving partial disclosure of facts intended to directly mislead
262 Petitioner for the purpose of inducing Petitioner to make decisions concerning the acceptance of
263 a loan product offered by the Lender.  Said loan product was more expensive than Petitioner
264 could legally afford. Agent acted with full knowledge that Petitioner would have made a
265 different decision had Agent given complete disclosure.

266   ***FRAUDULENT INDUCEMENT***

267   Lender maliciously induced Petitioner to accept a loan product, Lender knew, or should have
268   known, Petitioner could not afford in order to unjustly enrich Lender.

269   ***EXTRA PROFIT ON SALE OF PREDATORY LOAN PRODUCT***

270   Said more expensive loan product was calculated to produce a higher return when sold as a
271   security to an investor who was already waiting to purchase the loan as soon as it could be
272   consummated.

### Extra Commission for Late Payments

274   Lender acted with deliberate malice in order to induce Petitioner to enter into a loan agreement
275   that Lender intended Petitioner would have difficulty paying.  The industry standard payment to
276   the servicer for servicing a mortgage note is 3% of the amount collected.  However, if the
277   borrower is late on payments, a 5% late fee is added and this fee is retained by the servicer.
278   Thereby, the Lender stands to receive more than double the regular commission on collections if
279   the borrower pays late.

### Extra Income for Handling Foreclosure

281   Lender acted with deliberate malice in order to induce petitioner to enter into a loan agreement
282   on which Lender intended petitioner to default.  In case of default, the Lender, acting as servicer,
283   receives considerable funds for handling and executing the foreclosure process.

### Credit Default Swap Gambling

285   Lender, after deliberately creating a loan intended to default is now in a position to bet on credit
286   default swap, commonly referred to as a derivative as addressed more fully below.  Since Lender
287   designed the loan to fail, betting on said failure is essentially a sure thing.

288   ***LENDER ATTEMPTING TO FRAUDULENTLY COLLECT ON VOID LIEN***

289   Lender sold the security instrument after closing and received consideration in an amount in
290   excess of the lien held by Lender.  Since Lender retained the lien document upon the sale of the
291   security instrument, Lender separated the lien from said security instrument, creating a fatal and
292   irreparable flaw.

PRELIMINARY INJUNCTION           10 of 27

293   When Lender received consideration while still holding the lien and said consideration was in
294   excess of the amount of the lien, Lender was in a position such that he could not be harmed and
295   could not gain standing to enforce the lien.  The lien was, thereby, rendered void.

296   Since the separation of the lien from the security instrument creates such a considerable concern,
297   said separation certainly begs a question: "Why would the Lender retain the lien when selling the
298   security instrument?"

299   When you follow the money the answer is clear.  The Lender will hold the lien for three years,
300   then file an IRS Form 1099a and claim the full amount of the lien as abandoned funds and deduct
301   the full amount from Lender's tax liability, thereby, receiving consideration a second time.

302   Later, in the expected eventuality of default by petitioner, Lender then claimed to transfer the
303   lien to the holder of the security, however, the lien once satisfied, does not gain authority just
304   because the holder, after receiving consideration, decides to transfer it to someone else.

305   ### *LENDER PROFIT BY CREDIT DEFAULT SWAP DERIVATIVES*

306   Lender further stood to profit by credit default swaps in the derivatives market, by way of inside
307   information that Lender had as a result of creating the faulty loans sure to default.  Lender was
308   then free to invest on the bet that said loan would default and stood to receive unjust enrichment
309   a third time.  This credit default swap derivative market scheme is almost totally responsible for
310   the stock market disaster we now experience as it was responsible for the stock market crash in
311   1907.

312   ### *LENDER CHARGED FALSE FEES*

313   Lender charged fees to Petitioner that were in violation of the limitations imposed by the Real
314   Estate Settlement Procedures Act as said fees were simply contrived and not paid to a third party
315   vendor.

316   Lender charged other fees that were a normal part of doing business and should have been
317   included in the finance charge.

318   Below is a listing of the fees charged at settlement.  Neither at settlement, nor at any other time
319   did Lender or Trustee provide documentation to show that the fees herein listed were valid,
320   necessary, reasonable, and proper to charge Petitioner.

| 803 | Appraisal | $495.00 |
| 804 | Credit Report | $35.00 |
| 808 | Tax Service Contract | $70.00 |
| 809 | Flood Certification Fee | $26.00 |
| 810 | Lender Fee | $575.00 |
| 901 | Interest from 6/20/07  to7/1/07 @ $115.53/day | $1,270.83 |
| 903 | Hazard Insurance Premium | $939.00 |
| 1001 | Hazard Insurance | $234.75 |
| 1004 | County Property Taxes | $450.68 |
| 1101 | Settlement fee | $444.00 |
| 1106 | Supplemental Summary | $120.00 |
| 1107 | Email Loan Document Fee | $25.00 |
| 1108 | Title Insurance | $1,525.00 |
| 1109 | Messenger/Special Delivery Fee | $100.00 |
| 1110 | 8.1 Endorsement | $50.00 |
| 1111 | Incoming Wire Fee | $10.00 |
| 1112 | Escrow Fees for 2nd Loan | $75.00 |
| 1113 | Email loan document fee for 2nd Loan | $25.00 |
| 1201 | Recording Fee | $25.00 |

321  ### *LENDER SPLIT NOTE*

322  Lender, in order to hide the fact that borrower could not qualify for the purchase of the particular
323  property in question, engineered a fraud by separating the note into two separate loans.
324  Petitioner alleges and maintains that this second note was intended to defraud the eventual
325  purchaser of the security instrument and Petitioner.  By separating the note into two separate
326  loans, Lender made it appear that Petitioner would qualify for each note separately, when in fact,
327  they were not two loans, but one.

328  By artificially splitting the note into two separate loans, Lender dramatically increased the cost to
329  Petitioner.

330  ### *IMPROPER FEES FOR SECOND NOTE*

331  Lender charged fees to Petitioner that were contrived to increase costs to Petitioner and increase
332  profit to Lender.  Said fees were a contrivance and were totally false.  As with the first note
333  referenced above, Lender charged fees for services not rendered, took markups on fees actually
334  rendered, and charged Petitioner fees that were a normal part of doing business and should have
335  been included in the finance charge.

336  Debtor is unable to determine whether or not the above fees are valid in accordance with the
337  restrictions provided by the various consumer protection laws.  Therefore, please provide; a
338  complete billing from each vendor who provided the above listed services; the complete contact
339  information for each vendor who provided a billed service; clearly stipulate as to the specific

340   service performed; a showing that said service was necessary; a showing that the cost of said
341   service is reasonable; a showing of why said service is not a regular cost of doing business that
342   should rightly be included in the finance charge.

343   The above charges are hereby disputed and deemed unreasonable until such time as said charges
344   have been demonstrated to be reasonable, necessary, and in accordance with the limitations and
345   restrictions included in any and all laws, rules, and regulations intended to protect the consumer.

346   In the event lender fails to properly document the above charges, borrower will consider same as
347   false charges.  The effect of the above amounts that borrower would pay over the life of the note
348   will be an overpayment of $539,595.75  This amount will be reduced by the amount of items
349   above when said items are fully documented.

350   ***RESPA PENALTY***

351   From a cursory examination of the records, with the few available, the apparent RESPA
352   violations are as follows: Good Faith Estimate not within limits, No HUD-1 Booklet, Truth In
353   Lending Statement not within limits compared to Note, Truth in Lending Statement not timely
354   presented, HUD-1 not presented at least one day before closing, No Holder Rule Notice in Note,
355   No 1st Payment Letter.

356   The closing documents included no signed and dated :  Financial Privacy Act Disclosure; Equal
357   Credit Reporting Act Disclosure; notice of right to receive appraisal report; servicing disclosure
358   statement; borrower's Certification of Authorization; notice of credit score; RESPA servicing
359   disclosure letter; loan discount fee disclosure; business insurance company arrangement
360   disclosure; notice of right to rescind.

361   The courts have held that the borrower does not have to show harm to claim a violation of the
362   Real Estate Settlement Procedures Act, as the Act was intended to insure strict compliance. And,
363   in as much as the courts are directed to assess a penalty of no less than two hundred dollars and
364   no more than two thousand, considering the large number enumerated here, it is reasonable to
365   consider that the court will assess the maximum amount for each violation.

366   Since the courts have held that the penalty for a violation of RESPA accrues at consummation of
367   the note, borrower has calculated that, the number of violations found in a cursory examination
368   of the note, if deducted from the principal, would result in an overpayment on the part of the
369   borrower, over the life of the note, of $390,028.77.

370   If the violation penalty amounts for each of the unsupported fees listed above are included, the
371   amount by which the borrower would be defrauded is $314,971.20

372   Adding in RESPA penalties for all the unsupported settlement fees along with the TILA/Note
373   variance, it appears that lender intended to defraud borrower in the amount of $1,244,595.72

### *LENDER CONSPIRED WITH APPRAISER*

375   Lender, in furtherance of the above referenced conspiracy, conspired with appraiser for the
376   purpose of preparing an appraisal with a falsely stated price, in violation of appraiser's fiduciary
377   duty to Petitioner and appraiser's duty to provide fair and honest services, for the purpose of
378   inducing Petitioner to enter into a loan product that was fraudulent toward the interests of
379   Petitioner.

### *LENDER CONSPIRED WITH TRUSTEE*

381   Lender conspired with the trust Agent at closing to create a condition of stress for the specific
382   purpose of inducing Petitioner to sign documents without allowing time for Petitioner to read and
383   fully understand what was being signed.

384   The above referenced closing procedure was a carefully crafted connivance, designed and
385   intended to induce Petitioner, through shame and trickery, in violation of trustee's fiduciary duty
386   to Petitioner and the duty to provide fair and honest services, to sign documents that Petitioner
387   did not have opportunity to read and fully understand, thereby, denying Petitioner full disclosure
388   as required by various consumer protection statutes.

### *DECEPTIVE ADVERTISING AND OTHER UNFAIR BUSINESS PRACTICES*

390   In the manner in which Defendants have carried on their business enterprises, they have engaged
391   in a variety of unfair and unlawful business practices prohibited by *15 USC Section 45* et seq.
392   (Deceptive Practices Act).

393   Such conduct comprises a pattern of business activity within the meaning of such statutes, and
394   has directly and proximately caused Petitioner to suffer economic and non-economic harm and
395   detriment in an amount to be shown according to proof at trial of this matter.

396   **EQUITABLE TOLLING FOR TILA AND RESPA**

397   The Limitations Period for Petitioners' Damages Claims under TILA and RESPA should be
398   Equitably Tolled due to the DEFENDANTS' Misrepresentations and Failure to Disclose.

399   Any claims for statutory and other money damages under the Truth in Lending Act *(15 U.S.C. §*
400   *1601, et. Seq.)* and under the Real Estate Settlement Procedures Act *(12 U.S.C. § 2601* et. Seq.)
401   are subject to a one-year limitations period; however, such claims are subject to the equitable
402   tolling doctrine. The Ninth Circuit has interpreted the TILA limitations period in § 1640(e) as
403   subject to equitable tolling. In *King v. California, 784 F.2d 910 (9th Cir.1986),* the court held that
404   given the remedial purpose of TILA, the limitations period should run from the date of
405   consummation of the transaction, but that "the doctrine of equitable tolling may, in appropriate
406   circumstances, suspend the limitations period until the borrower discovers or has reasonable
407   opportunity to discover the fraud or nondisclosures that form the basis of the TILA action." *King*
408   *v. California, 784 F.2d 910, 915 9th* Cir. 1986).

409   Likewise, while the Ninth Circuit has not taken up the question whether *12 U.S.C. § 2614,* the
410   anti-kickback provision of **RESPA,** is subject to equitable tolling, other Courts have, and hold
411   that such limitations period may be equitably tolled. The Court of Appeals for the District of
412   Columbia held that § 2614 imposes a strictly jurisdictional limitation, *Hardin v. City Title &*
413   *Escrow Co., 797 F.2d 1037, 1039-40 (D.C. Cir. 1986),* while the Seventh Circuit came to the
414   opposite conclusion. *Lawyers Title Ins. Corp. v. Dearborn Title Corp., 118 F.3d 1157, 1164 (7th*
415   *Cir. 1997).* District courts have largely come down on the side of the Seventh Circuit in holding
416   that the one-year limitations period in § 2614 is subject to equitable tolling. See, e.g., *Kerby v.*
417   *Mortgage Funding Corp., 992 F.Supp. 787, 791-98 (D.Md.1998); Moll v. U.S. Life Title Ins. Co.,*
418   *700 F.Supp. 1284, 1286-89 (S.D.N.Y.1988).* Importantly, the Ninth Circuit, as noted above, has
419   interpreted the TILA limitations period in *15 U.S.C. § 1640* as subject to equitable tolling; the
420   language of the two provisions is nearly identical. *King v. California, 784 F.2d at 914.* While not
421   of precedential value, this Court has previously found both the TILA and **RESPA** limitations
422   periods to be subject to equitable tolling. *Blaylock v. First American Title Ins. Co., 504*
423   *F.Supp.2d 1091,* (W.D. Wash. 2007). 1106-07.

424   The Ninth Circuit has explained that the doctrine of equitable tolling "focuses on excusable delay
425   by the Petitioner," and inquires whether "a reasonable Petitioner would … have known of the
426   existence of a possible claim within the limitations period." *Johnson v. Henderson, 314 F.3d*

427   *409, 414 (9th Cir.2002), Santa Maria v. Pacific Bell, 202 F.3d 1170, 1178 (9th Cir.2000).*

428   Equitable tolling focuses on the reasonableness of the Petitioner's delay and does not depend on

429   any wrongful conduct by the Defendants. Santa Maria. At 1178.

430   ***BUSINESS PRACTICES CONCERNING DISREGARDING OF UNDERWRITING***

431   ***STANDARDS***

432   Traditionally, Lenders required borrowers seeking mortgage loans to document their income and

433   assets by, for example, providing W-2 statements, tax returns, bank statements, documents

434   evidencing title, employment information, and other information and documentation that could

435   be analyzed and investigated for its truthfulness, accuracy, and to determine the borrower's

436   ability to repay a particular loan over both the short and long term. Defendants deviated from and

437   disregarded these standards, particularly with regard to its riskier and more profitable loan

438   products.

439   **Low-Documentation/No-Documentation Loans.**

440   Driven by its desire for market share and a perceived need to maintain competitiveness with the

441   likes of Countrywide, Defendants began to introduce an ever increasing variety of low and no

442   documentation loan products, including the HARMs and HELOCs described hereinabove, and

443   began to deviate from and ease its underwriting criteria, and then to grant liberal exceptions to

444   the already eased underwriting standards to the point of disregarding such standards. This

445   quickened the loan origination process, allowing for the generation of more and more loans

446   which could then be resold and/or securitized in the secondary market.

447   Defendants marketed no-documentation/low-documentation loan programs that included

448   HARMs and HELOCs, among others, in which loans were given based on the borrower's "stated

449   income" or "stated assets" (SISA) neither of which were verified. Employment was verbally

450   confirmed, if at all, but not further investigated, and income, if it was even considered as a factor,

451   was to be roughly consistent with incomes in the types of jobs in which the borrower was

452   employed. When borrowers were requested to document their income, they were able to do so

453   through information that was less reliable than in a full-documentation loan.

454   For stated income loans, it became standard practice for loan processors, loan officers and

455   underwriters to rely on www.salary.com to see if a stated income was reasonable. Such stated

456   income loans, emphasizing loan origination from a profitability standpoint at the expense of

457   determining the ability of the borrower to repay the loan from an underwriting standpoint,
458   encouraged the overstating and/or fabrication of income.

459   **Easing of Underwriting Standards**

460   In order to produce more loans that could be resold in the secondary mortgage market,
461   Defendants also relaxed, and often disregarded, traditional underwriting standards used to
462   separate acceptable from unacceptable risk. Examples of such relaxed standards were reducing
463   the base FICO score needed for a SISA loan.

464   Other underwriting standards that Defendants relaxed included qualifying interest rates (the rate
465   used to determine whether borrowers can afford the loan), loan to value ratios (the amount of
466   loan(s) compared to the appraised/sale price of the property, whichever is lower), and debt-to-
467   income ratios (the amount of monthly income compared to monthly debt service payments and
468   other monthly payment obligations.

469   With respect to HARMS, Defendants underwrote loans without regard to the borrower's long-
470   term financial circumstances, approving the loan based on the initial fixed rate without taking
471   into account whether the borrower could afford the substantially higher payment that would
472   inevitably be required during the remaining term of the loan.

473   With respect to HELOCs, Defendants underwrote and approved such loans based only on the
474   borrower's ability to afford the interest-only payment during the initial draw period of the loan,
475   rather than on the borrower's ability to afford the subsequent, fully amortized principal and
476   interest payments.

477   As Defendants pushed to expand market share, they eased other basic underwriting standards.
478   For example, higher loan-to-value (LTV) and combined loan-to-value (CLTV) ratios were
479   allowed. Likewise, higher debt-to-income (DTI) ratios were allowed. At the same time that they
480   eased underwriting standards the Defendants also were encouraging consumers to go further into
481   debt in order to supply the very lucrative aftermarket of mortgage backed securities. The relaxed
482   underwriting standards created the aftermarket supply they needed. As a result, the Defendants
483   made it easy for the unwary consumer to take on more debt than he could afford by encouraging
484   unsound financial practices, all the while knowing defaults would occur more and more
485   frequently as the credit ratios of citizens reached the limit of the new relaxed underwriting
486   standards.

PRELIMINARY INJUNCTION          17 of 27

487  Defendants knew, or in the exercise of reasonable care should have known, from its own
488  underwriting guidelines industry standards that it was accumulating and selling/reselling risky
489  loans that were likely to end up in default. However, as the pressure mounted to increase market
490  share and originate more loans, Defendants began to grant "exceptions" even to its relaxed
491  underwriting guidelines. Such was the environment that loan officers and underwriters were,
492  from time to time, placed in the position of having to justify why they did not approve a loan that
493  failed to meet underwriting criteria.

494  **Risk Layering**

495  Defendants compromised its underwriting even further by risk layering, i.e. combining high risk
496  loans with one or more relaxed underwriting standards.

497  Defendants knew, or in the exercise of reasonable care should have known, that layered risk
498  would increase the likelihood of default. Among the risk layering Defendants engaged in were
499  approving HARM loans with little to no down payment, little to no documentation, and high
500  DTI/LTV/CLTV ratios. Despite such knowledge, Defendants combined these very risk factors in
501  the loans it promoted to borrowers.

502  Loan officers and mortgage Agents aided and abetted this scheme by working closely with other
503  mortgage Lenders/mortgage bankers to increase loan originations, knowing or having reason to
504  believe that Defendants and other mortgage Lenders/mortgage bankers with whom they did
505  business ignored basic established underwriting standards and acted to mislead the borrower, all
506  to the detriment of the borrower and the consumer of loan products..

507  Petitioner is informed and believe, and on that basis allege, that Defendants, and each of them,
508  engaged and/or actively participated in, authorized, ratified, or had knowledge of, all of the
509  business practices described above in paragraphs 30-42 of this Complaint

510  ***UNJUST ENRICHMENT***

511  Petitioner is informed and believes that each and all of the Defendants received a benefit at
512  Petitioner's expense, including but not limited to the following: To the Agent, commissions,
513  yield spread premiums, spurious fees and charges, and other "back end" payments in amounts to
514  be proved at trial; To the originating Lender, commissions, incentive bonuses, resale premiums,
515  surcharges and other "back end" payments in amounts to be proved at trial; To the investors,

PRELIMINARY INJUNCTION          18 of 27

516   resale premiums, and high rates of return; To the servicers including EMS, servicing fees,
517   percentages of payment proceeds, charges, and other "back end" payments in amounts to be
518   proved at trial; To all participants, the expectation of future revenues from charges, penalties and
519   fees paid by Petitioner when the unaffordable LOAN was foreclosed or refinanced.

520   By their misrepresentations, omissions and other wrongful acts alleged heretofore, Defendants,
521   and each of them, were unjustly enriched at the expense of Petitioner, and Petitioner was unjustly
522   deprived, and is entitled to restitution in the amount of $1,244,595.72

523   ***CLAIM TO QUIET TITLE.***

524   Petitioner properly averred a claim to quiet title. Petitioner included both the street address, and
525   the Assessor's Parcel Number for the property. Petitioner has set forth facts concerning the title
526   interests of the subject property. Moreover, as shown above, Petitioner's claims for rescission
527   and fraud are meritorious. As such, Petitioner's bases for quiet title are meritorious as well.

528   Defendants have no title, estate, lien, or interest in the Subject Property in that the purported
529   power of sale contained in the Deed of Trust is of no force or effect because Defendants' security
530   interest in the Subject Property has been rendered void and that the Defendants are not the holder
531   in due course of the Promissory Note. Moreover, because Petitioner properly pled all
532   Defendants' involvement in a fraudulent scheme, all Defendants are liable for the acts of its co-
533   conspirators,

534         "a Petitioner is entitled to damages from those Defendants who concur in the tortuous
535         scheme with knowledge of its unlawful purpose." *Wyatt v. Union Mortgage Co., 24 Cal.*
536         *3d 773, 157 Cal. Rptr. 392, 598 P.2d 45 (1979); Novartis Vaccines and Diagnostics, Inc.*
537         *v. Stop Huntingdon Animal Cruelty USA, Inc., 143 Cal. App. 4th 1284, 50 Cal. Rptr. 3d*
538         *27 (1st Dist. 2006); Kidron v. Movie Acquisition Corp., 40 Cal. App. 4th 1571, 47 Cal.*
539         *Rptr. 2d 752 (2d Dist. 1995).*

540   ***SUFFICIENCY OF PLEADING***

541   Petitioner has sufficiently pled that relief can be granted on each and every one of the
542   Complaint's causes of action. A complaint should not be dismissed "unless it appears beyond
543   doubt that the Petitioner can prove no set of facts in support of Petitioner claim which would
544   entitle Petitioner to relief." *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* "All

545   allegations of material fact in the complaint are taken as true and construed in the light most
546   favorable to Petitioner." *Argabright v. United States, 35 F.3d 1476, 1479 (9th Cir. 1996).*

547   Attendant, the Complaint includes a "short, plain statement, of the basis for relief." Fed. Rule Civ. Proc.
548   8(a). The Complaint contains cognizable legal theories, sufficient facts to support cognizable legal
549   theories, and seeks remedies to which Petitioner is entitled.  *Balistreri v. Pacifica Police Dept., 901 F.2d*
550   *696, 699 (9th Cir. 1988); King v. California, 784 F.2d 910, 913 (9th Cir. 1986).* Moreover, the legal
551   conclusions in the Complaint can and should be drawn from the facts alleged, and, in turn, the court
552   should accept them as such. *Clegg v. Cult Awareness Network, 18 F.3d 752* (9th Cir, 1994). Lastly,
553   Petitioner's complaint contains claims and has a probable validity of proving a "set of facts" in support of
554   their claim entitling them to relief. *Housley v. U.S. (9th Cir. Nev. 1994) 35 F.3d 400, 401.* Therefore, relief
555   as requested herein should be granted.

556                               **CAUSES OF ACTION**

557        ***BREACH OF FIDUCIARY DUTY***

558   Defendants Agent, appraiser, trustee, Lender, et al, and each of them, owed Petitioner a fiduciary
559   duty of care with respect to the mortgage loan transactions and related title activities involving
560   the Trust Property.

561   Defendants breached their duties to Petitioner by, *inter alia,* the conduct described above. Such
562   breaches included, but were not limited to, ensuring their own and Petitioners' compliance with
563   all applicable laws governing the loan transactions in which they were involved, including but
564   not limited to, TILA, HOEPA, **RESPA** and the Regulations X and Z promulgated there under.

565   Defendant's breaches of said duties were a direct and proximate cause of economic and non-
566   economic harm and detriment to Petitioner(s).

567   Petitioner did suffer economic, non-economic harm, and detriment as a result of such conduct,
568   all to be shown according to proof at trial of this matter.

569        ***CAUSE OF ACTION – NEGLIGENCE/NEGLIGENCE PER SE***

570   Defendants owed a general duty of care with respect to Petitioners, particularly concerning their
571   duty to properly perform due diligence as to the loans and related transactional issues described
572   hereinabove.

573   In addition, Defendants owed a duty of care under TILA, HOEPA, **RESPA** and the Regulations
574   X and Z promulgated there under to, among other things, provide proper disclosures concerning
575   the terms and conditions of the loans they marketed, to refrain from marketing loans they knew
576   or should have known that borrowers could not afford or maintain, and to avoid paying undue
577   compensation such as "yield spread premiums" to mortgage Agents and loan officers.

578   Defendants knew or in the exercise of reasonable care should have known, that the loan
579   transactions involving Petitioner and other persons similarly situated were defective, unlawful,
580   violative of federal and state laws and regulations, and would subject Petitioner to economic and
581   non-economic harm and other detriment.

582   Petitioner is among the class of persons that TILA, HOEPA, **RESPA** and the Regulations X and
583   Z promulgated there under were intended and designed to protect, and the conduct alleged
584   against Defendants is the type of conduct and harm which the referenced statutes and regulations
585   were designed to deter.

586   As a direct and proximate result of Defendant's negligence, Petitioner suffered economic and
587   non-economic harm in an amount to be shown according to proof at trial.

588   ### *AGENT: COMMON LAW FRAUD*

589   If any Agents' misrepresentations made herein were not intentional, said misrepresentations were
590   negligent. When the Agents made the representations alleged herein, he/she/it had no reasonable
591   ground for believing them to be true.

592   Agents made these representations with the intention of inducing Petitioner to act in reliance on
593   these representations in the manner hereafter alleged, or with the expectation that Petitioner
594   would so act.

595   Petitioner is informed and believes that Agent et al, facilitated, aided and abetted various Agents
596   in their negligent misrepresentation, and that various Agents were negligent in not implementing
597   procedures such as underwriting standards oversight that would have prevented various Agents
598   from facilitating the irresponsible and wrongful misrepresentations of various Agents to
599   Defendants.

600   Petitioner is informed and believes that Agent acted in concert and collusion with others named
601   herein in promulgating false representations to cause Petitioner to enter into the LOAN without
602   knowledge or understanding of the terms thereof.

603   As a proximate result of the negligent misrepresentations of Agents as herein alleged, the
604   Petitioner sustained damages, including monetary loss, emotional distress, loss of credit, loss of
605   opportunities, attorney fees and costs, and other damages to be determined at trial. As a
606   proximate result of Agents' breach of duty and all other actions as alleged herein, Defendants has
607   suffered severe emotional distress, mental anguish, harm, humiliation, embarrassment, and
608   mental and physical pain and anguish, all to Petitioner's damage in an amount to be established
609   at trial.

610   ***PETITIONER PROPERLY AVERRED A CLAIM FOR BREACH OF THE IMPLIED***
611   ***COVENANT OF GOOD FAITH AND FAIR DEALING.***

612   Petitioner properly pled Defendants violated the breach of implied covenant of good faith and
613   fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its
614   performance and its enforcement." *Price v. Wells Fargo Bank, 213 Cal.App.3d 465, 478, 261*
615   *Cal. Rptr. 735 (1989);* Rest.2d Contracts § 205. A mortgage Agent has fiduciary duties. *Wyatt v.*
616   *Union Mortgage Co., (1979) 24 Cal. 3d. 773.* Further, In *Jonathan Neil & Associates, Inc. v*
617   *Jones, (2004) 33 Cal. 4th 917,* the court stated:

618   In the area of insurance contracts the covenant of good faith and fair dealing has taken on a
619   particular significance, in part because of the special relationship between the insurer and the
620   insured. The insurer, when determining whether to settle a claim, must give at least as much
621   consideration to the welfare of its insured as it gives to its own interests. . . The standard is
622   premised on the insurer's obligation to protect the insured's interests . . . *Id. At 937.*

623   Likewise, there is a special relationship between an Agent and borrower. "A person who
624   provides Agency services to a borrower in a covered loan transaction by soliciting Lenders or
625   otherwise negotiating a consumer loan secured by real property, is the fiduciary of the
626   consumer…this fiduciary duty [is owed] to the consumer regardless of whom else the Agent may
627   be acting as an Agent for . . . The fiduciary duty of the Agent is to deal with the consumer in
628   *good faith.* If the *Agent knew or should have known that the Borrower will or has a likelihood of*
629   *defaulting … they have a fiduciary duty to the borrower not* to place them in that loan."

630   (California Department of Real Estate, *Section 8: Fiduciary Responsibility,* www.dre.ca.gov).

631   [*Emphasis Added*].

632   All Defendants, willfully breached their implied covenant of good faith and fair dealing with

633   Petitioner when Defendants: (1) Failed to provide all of the proper disclosures; (2) Failed to

634   provide accurate Right to Cancel Notices; (3) Placed Petitioner into Petitioner's current loan

635   product without regard for other more affordable products; (4) Placed Petitioner into a loan

636   without following proper underwriting standards; (5) Failed to disclose to Petitioner that

637   Petitioner was going to default because of the loan being unaffordable; (6) Failed to perform

638   valid and /or properly documented substitutions and assignments so that Petitioner could

639   ascertain Petitioner rights and duties; and (7) Failed to respond in good faith to Petitioner's

640   request for documentation of the servicing of Petitioner's loan and the existence and content of

641   relevant documents. Additionally, Defendants breached their implied covenant of good faith and

642   fair dealing with Petitioner when Defendants initiated foreclosure proceedings even without the

643   right under an alleged power of sale because the purported assignment was not recorded and by

644   willfully and knowingly financially profiting from their malfeasance. Therefore, due to the

645   special relationship inherent in a real estate transaction between Agent and borrower, *and* all

646   Defendants' participation in the conspiracy, the Motion to Dismiss should be denied.

647   ### *CAUSE OF ACTION VIOLATION OF TRUTH IN LENDING ACT 15 U.S.C. §1601 ET*

648   ### *SEQ*

649   Petitioner hereby incorporates by reference, re-pleads and re-alleges each and every allegation

650   contained in all of the paragraphs of the General Allegations and Facts Common to All Causes of

651   Action as though the same were set forth herein.

652   Petitioner is informed and believes that Defendant's violation of the provisions of law rendered

653   the credit transaction null and void, invalidates Defendant's claimed interest in the Subject

654   Property, and entitles Petitioner to damages as proven at trial.

655   ### *INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS*

656   The conduct committed by Defendants, driven as it was by profit at the expense of increasingly

657   highly leveraged and vulnerable consumers who placed their faith and trust in the superior

658   knowledge and position of Defendants, was extreme and outrageous and not to be tolerated by

659   civilized society.

660   Defendants either knew that their conduct would cause Petitioner to suffer severe emotional
661   distress, or acted in conscious and/or reckless disregard of the probability that such distress
662   would occur.

663   Petitioner did in fact suffer severe emotional distress as an actual and proximate result of the
664   conduct of Defendants as described hereinabove.

665   As a result of such severe emotional distress, Petitioner suffered economic and non economic
666   harm and detriment, all to be shown according to proof at trial of this matter.

667   Petitioner demands that Defendants provide Petitioner with release of lien on the lien signed by
668   Petitioner and secure to Petitioner quite title;

669   Petitioner demands Defendants disgorge themselves of all enrichment received from Petitioner
670   as payments to Defendants based on the fraudulently secured promissory note in an amount to be
671   calculated by Defendants and verified to Petitioner;

672   Petitioner further demands that Defendants pay to Petitioner an amount equal to treble the
673   amount Defendants intended to defraud Petitioner of which amount Petitioner calculated to be
674   equal to $3,733,787.16

675                          **REQUEST FOR TEMPORARY INJUNCTION**

676        Plaintiff will suffer imminent and irreparable injury if defendant is not enjoined from
677   foreclosing on the property owned by Plaintiff. Fed. R. Civ. P. 65(b)(1); *see Sampson v. Murray*,
678   415 U.S. 61, 88-89 & n.59, 94 S. Ct. 937, 951-52 & n.59 (1974).

679        There is no adequate remedy at law because once the foreclosure sale has taken place
680   Plaintiff will suffer the complete loss of the property as defendant will sell the property to a third
681   party who will have a right to possession without regard to the claims Plaintiff has against
682   defendant. {*See N. Cal. Power Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306, 105 S.*
683   *Ct. 459, 459 (1984); Wilson v. Ill. S. Ry. Co., 263 U.S. 574, 576-77, 44 S. Ct. 203, 203-04*
684   *(1924); Winston v. Gen. Drivers, Warehousemen & Helpers Local Un. No. 89, 879 F. Supp. 719,*
685   *725 (W.D. Ky. 1995.*

686        There is a substantial likelihood that plaintiff will prevail on the merits. *Schiavo v. Schiavo*,
687   403 F.3d 1223, 1225 (11th Cir. 2005). Plaintiff will be able to show that:

688        Defendant has no agency to represent the real party in interest;

PRELIMINARY INJUNCTION            24 of 27

689       •   that the alleged real party in interest is unable to prove standing foreclose against and
690          sell the property;

691       •   that the lender committed numerous acts, as listed above, that have the effect of
692          rendering the contract, through which defendant claims authority, void and
693          unenforceable.

694      The threatened harm to plaintiff outweighs the harm that a preliminary injunction would
695 inflict on defendant. *Schiavo*, 403 F.3d at 1225-26. If defendant is temporarily restrained from
696 selling the instant property, the defendant an plaintiff will befit as if plaintiff is forced to vacate
697 the property, the property will sit empty for the duration of the action. Plaintiff will suffer loss of
698 the use of said property and will loose opportunity to maintain same and defendant will suffer
699 loss by having to maintain an empty property that cannot be insured.

700      Issuance of a preliminary injunction would not adversely affect the public interest and public
701 policy because there are already a great number of empty houses with the current residential
702 foreclosure mess. Adding more will simply increase the burden on the local as it will create
703 opportunity for vandalism and further other criminal activity.

704      Plaintiff is willing to post a bond in the amount the court deems appropriate.

705      The court should enter this preliminary injunction without notice to defendant because
706 plaintiff will suffer immediate and irreparable injury, loss, or damage if the order is not granted
707 before defendant can be heard as **defendant has scheduled the above referenced sale for the**
708 **week of September 2nd, 2010.** *First Tech. Safety Sys. V. Depinet*, 11 F.3d 641, 650 (6th Cir.
709 1993). If said sale is allowed to take place, Plaintiff will be irreparably harm. {*See O'Connor's*
710 *Federal Rules, "Ex parte," ch. 2-D, §3.1.3, p. 77.*}

711      Plaintiff asks the court to set the request for a preliminary injunction for hearing at the
712 earliest possible time.

713                               **CONCLUSION**

714      13. Plaintiff has filed suit against defendant wherein Plaintiff has claimed numerous causes
715 of action against defendant. A number of the allegations made by Plaintiff are □ncontrovertible
716 by defendant, therefore, Plaintiff will prevail on a number of the above allegations by way if

717   existing records.  For these reasons, plaintiff asks the court to issue a preliminary injunction
718   preventing defendant from foreclosing on the property.

719                                          **PRAYER**

720          15. For these reasons, plaintiff asks that the court do the following:

721          a.   Defendant be prevented from foreclosing on and selling the property until and
722               unless defendant prevails in the current litigation.

723          b.   Enter judgment for plaintiff.

724          c.   Award costs of court.

725          d.   Grant any other relief it deems appropriate.

726   **Respectfully Submitted,**
727
728   *Jo-Ann Chianella*
729   **Jo-Ann Chianella**
730   **18521 E. Queen Creek Rd., Ste. 105-604**
731   **Queen Creek, AZ 85142**
732   **480-430-3580**

733 **VERIFICATION**

734

735

736 I, Jo-Ann Chianella , do swear and affirm that all statements made herein are true and accurate,

737 in all respects, to the best of my knowledge.

738 Jo-Ann Chianella
739 18521 E Queen Creek Rd., Ste 105-604
740 Queen Creek , AZ
741 480-430-3580
742

743

744 SWORN TO AND SUBSCRIBED BEFORE ME, Tara N Parsons, by JoAnn Chianella

745 _____, on the 18 day of Aug _____, 2010, which witnesses my hand and seal of office.

746

747 

748 **NOTARY PUBLIC IN AND FOR**

749 **THE STATE OF ARIZONA**

TARA N. PARSONS
Notary Public - Arizona
MARICOPA COUNTY
My Commission Expires
APRIL 28, 2013